IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**INDERSINGH JANDA,**                                  Case 1:14 CV 1490

      Plaintiff,                                         Judge John R. Adams

      v.                                                 Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

      Defendant.                                         REPORT AND RECOMENDATION

### INTRODUCTION

Plaintiff Indersingh Janda filed a Complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. § 405(g). This matter has been referred to the undersigned for a Report and Recommendation pursuant to Local Rule 72.2(b) (1). (Non-document entry dated July 7, 2014). For the reasons stated below, the undersigned recommends the Commissioner's decision be reversed and remanded.

### PROCEDURAL BACKGROUND

Plaintiff filed for DIB in December 2009, alleging a disability onset date of June 15, 2007. (Tr. 138). Plaintiff applied for benefits due to a heart condition, depression, diabetes, memory loss, and brain injury. (Tr. 299, 351, 737). His claim was denied initially June 30, 2010 (Tr. 90) and upon reconsideration on June 7, 2011 (Tr. 99). Plaintiff requested a hearing before an administrative law judge ("ALJ") on July 24, 2011. (Tr. 106). Plaintiff, represented by counsel, and a vocational expert ("VE") testified at a hearing before the ALJ on November 7, 2012. (Tr. 28). The ALJ denied Plaintiff's claim for DIB on February 1, 2013. (Tr. 9-22). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final

decision of the Commissioner. (Tr. 1); 20 C.F.R. §§ 404.955, 404.981.  Plaintiff filed the instant action on July 7, 2014. (Doc. 1).

## FACTUAL BACKGROUND

### *Personal Background and Testimony*

At Plaintiff's initial interview, the interviewer noted Plaintiff had no difficulty with concentrating, understanding, coherency, answering, talking, reading, or writing. (Tr. 293). However, the interviewer did note it was a "very difficult interview" because Plaintiff did not have an appointment, could not provide exact dates, and did not have necessary documentation. (Tr. 293).

On a March 13, 2010 Adult Function Report, Plaintiff reported he could speak, read, and understand English, however reports dated later that month were completed by Plaintiff's son. (Tr. 298, 309, 321). Plaintiff said on a typical day he exercised for an hour, relaxed, did minor chores such as vacuuming, laundry, and watering plants, spent time with his family, watched TV, and sometimes went out with his family. (Tr. 325, 327). He also reported he had no problems dressing, bathing, or caring for his personal hygiene and that he did not need reminders to do these activities or take his medication. (Tr. 326). Plaintiff stated he could drive, walk, go out alone, pay bills, and handle money. (Tr. 327-28). He claimed he was prone to fatigue quicker than before, had trouble maintaining concentration, and could not lift anything over twenty pounds. (Tr. 329).

In July 2010, Plaintiff reported he had been diagnosed with diabetes, depression, and had been having "significant problems with memory, confusion, and fatigue". (Tr. 333). On a Disability Report, Plaintiff's attorney indicated he was very sad and depressed, avoided eye contact, and did not seem to follow the conversation. (Tr. 337).

2

A September 2010 report, completed by Plaintiff's wife, showed Plaintiff did not need reminders to care for himself or take his medication. (Tr. 344). He no longer performed as many household chores, now only mowing part of the lawn. (Tr. 346). Plaintiff still went out to walk for exercise but he could no longer go anywhere alone because he would forget where he was. (Tr. 346). His ability to pay bills and handle transactions had also diminished. (Tr. 347). Plaintiff also reported feeling increased anxiety and frustrations around other people, including authority figures such as the police. (Tr. 347-48). Further Plaintiff estimated his physical limitations had increased, stating he could only walk, stand, or climb for ten minutes before he became winded and had chest pain. (Tr. 348).

At the hearing Plaintiff testified with the aid of a Hindi interpreter. (Tr. 30). Plaintiff also testified that he takes an interpreter with him to doctor's visits because "he doesn't understand too much". (Tr. 46). Plaintiff was born on March 15, 1956, and was 56 years old at the time of the date last insured, December 31, 2012. (Tr. 152). He had completed high school. (Tr. 300). Plaintiff lived with his wife, son, and a niece who did the housework. (Tr. 36). His two brothers, their families, and his parents lived about a half a mile from his house. (Tr. 36).

Plaintiff and his wife own Gepetto's Pizza, a carry-out restaurant which they bought for their son to manage. (Tr. 37, 53-54). The restaurant is usually staffed by his wife, in addition to her full-time job, and his son but Plaintiff is there about ten to fifteen hours a week. (Tr. 37, 47, 50). Plaintiff stated that he would go to the restaurant because if he stayed home he went crazy, he got bored, and his family worried about him. (Tr. 37). While Plaintiff is at the restaurant, he stated he mainly watched TV, but did some light work such as inventory and accounting paperwork. (Tr. 38, 47). Although he testified he sometimes made pizzas, he said he never did deliveries or waited on customers. (Tr. 38, 48).

3

This is in contrast to statements made earlier where Plaintiff stated if an employee at Gepetto's had questions they would call him, his wife, or his son. (Tr. 296). He also said that all three of them made the business decisions together; he hired and fired people, and paid the restaurant's bills. (Tr. 296). He testified that even before his conditions he did not usually take orders because he did not understand English. (Tr. 55). He also claimed the last time he waited on customers was three years ago and he stopped because he was mixing up their orders. (Tr. 48).

Prior to the pizza shop, Plaintiff worked as a parts assembler and inspector. (Tr. 39, 41). Plaintiff stated he was fired from his job as a parts assembler because he was not able to keep up with production after his heart surgery due to fatigue and drowsiness. (Tr. 41). Plaintiff said along with his medical conditions, his inability to speak the language was a deterrent to working. (Tr. 43).

He stated he suffered from headaches, heart palpitations, fatigue, and was on numerous medications. (Tr. 42). At times Plaintiff said he felt like he was going crazy and wanted to die. (Tr. 43). He testified he was sad, got angry with himself over his inadequacies, and was confused. (Tr. 43-44). Plaintiff said he was constantly out of breath and got the shivers from nervousness when his blood sugar was high. (Tr. 45). He said he could not remember his doctor's name and someone else usually made his medical appointments for him. (Tr. 47). He testified that he was often confused about what medications he was taking and thought his confusion might be brought on by high blood sugar. (Tr. 51).

### *Police Reports*

In two reports to the Bay Village Police in 2007 from Gepetto's, Plaintiff was working at the restaurant and was interviewed in the police reports. (Tr. 464, 469). In June 2009, Plaintiff

4

called the Bay Village Police to the restaurant to report a breaking and entering. (Tr. 470). Plaintiff reported he had come to open the store at 11:10 a.m. and found the money in the register missing, but he also reported he did not know about the missing money until after he had helped a customer and was going to make change. (Tr. 475-76). At the time, the police reported Plaintiff "spoke very broken English". (Tr. 476).

On May 10, 2010, the Solon Police were called to Plaintiff's home regarding a domestic disturbance involving Plaintiff and his two sons who were arguing over work issues. (Tr. 375). Plaintiff had become angry, thrown a pot of rice at the wall, called the police, and then left the residence. (Tr. 375). The report stated Plaintiff was "somewhat confused and 'out of it'" and was not responding well to the officer's questions. (Tr. 375). At this time Plaintiff made statements that, "he wanted to die, his life was over, and officers should shoot him" after which he was transported to the hospital by EMS. (Tr. 375).

***Relevant Medical Evidence***

In January 2005 Plaintiff presented at the hospital with chest pain and a cardiac catheterization was performed and coronary artery bypass surgery was recommended. (Tr. 390). Plaintiff was diagnosed with Type II diabetes, hyperlipidemia, and hypertension. (Tr. 392). Later in the month Plaintiff was administered a cardiac stress test, the results of which were normal and showed no ischemia. (Tr. 421). At the end of January, Plaintiff underwent coronary artery bypass surgery, to which he responded well. (Tr. 432-37, 445, 492).

In March 2010, Plaintiff was seen for an initial visit with Felix Nwaokafor, M.D., where he reported fatigue and memory loss. (Tr. 609). However, Plaintiff reported he was not depressed, had no suicidal ideations or hallucinations, no anxiety, and no insomnia. (Tr. 610). Dr. Nwaokafor observed Plaintiff to be alert, oriented, well-appearing, with normal speech. (Tr.

617). Plaintiff later called back to the office and reported he was driving home from work and that "everything happened with my blood sugars because I had stopped my meds for the last few months." (Tr. 601). At a follow-up appointment on May 5, 2010, Dr. Nwaokafor reported Plaintiff's mood, memory, affect, and judgment were all normal. (Tr. 612).

On May 10, 2010, following his encounter with the Solon Police, Plaintiff was admitted to Hillcrest Hospital for depression and suicidal thoughts. (Tr. 575-76). His mental status examination revealed normal appearance, mood/affect, speech, thought content, thought process, orientation, and cognition. (Tr. 577). It was also noted Plaintiff was alert and in only mild distress, however he was uncooperative and uncommunicative. (Tr. 578). Plaintiff was discharged the next day with a diagnosis of situational depression. (Tr. 577, 579).

Later that month, Plaintiff saw Dr. Nwaokafor for a routine follow-up for diabetes management. (Tr. 594). Plaintiff stated he was feeling a lot better and Dr. Nwaokafor noted Plaintiff was alert, oriented, well-appearing, in no distress, and had normal speech. (Tr. 595-96). It was also noted that Plaintiff's primary written and spoken language was English and he did not need an interpreter. (Tr. 596). In August 2010, Plaintiff again followed-up with Dr. Nwaokafor relating to his uncontrolled diabetes. (Tr. 680). His blood sugars were high despite Plaintiff stating he was "doing all he can". (Tr. 681). Again, Dr. Nwaokafor reported Plaintiff was alert, playful, active, oriented, and had normal speech. (Tr. 682).

Throughout 2011 and 2012, Plaintiff continued to see Dr. Nwaokafor who consistently reported poor compliance with diabetes management and laboratory testing. (Tr. 761, 766, 773, 784, 811, 813). Furthermore, Dr. Nwaokafor noted on multiple occasions Plaintiff was alert, well-appearing, oriented, in no distress, and did not need a translator. (Tr. 761, 768, 799, 803, 808).

In July 2011, Plaintiff saw psychiatrist Shila Mathew, M.D., regarding his depression. (Tr. 842). His chief complaint remained his fatigue, although he also reported financial problems, insomnia, confusion, and apathy. (Tr. 844). Dr. Mathew noted she had difficulty communicating with Plaintiff, who said he needs help to get social security. (Tr. 844). She also stated Plaintiff was relying solely on medication to change his conditions and not following recommendations regarding exercise, diet, and communication with his family. (Tr. 844). She observed flat affect, depressed mood, no thought disorder, no cognitive changes, lack of motivation, and poor insight/judgment. (Tr. 844). She assigned him a Global Assessment of Functioning ("GAF") score of 50[1].

Plaintiff returned in September 2011, stating he was doing a little better but was still depressed. (Tr. 847-48). He had noted improvement in cognitive functioning, was less forgetful, and initiated more things. (Tr. 848). Dr. Mathews observed an improved mood, brighter affect, and only mild cognitive difficulties. (Tr. 848). She increased his GAF score to 55[2]. On October 25, 2011, Plaintiff had another appointment with Dr. Mathew where he reported feeling better but was still worrying about everything in his life. (Tr. 851). He was more talkative and his affect was brighter but he was preoccupied with financial problems. (Tr. 851). She again increased his

---

1. The GAF scale represents a "clinician's judgment" of an individual's symptom severity or level of functioning. American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders, 32-33 (4th ed., Text Rev. 2000) (DSM-IV-TR). A GAF score of 41-50 indicates serious symptoms (e.g., suicidal ideation, sever obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job). *Id.* at 34.
2. A GAF score of 51-60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.*

GAF score to 65[3]. Plaintiff's depression continued to stabilize on medication and Dr. Mathew noted Plaintiff was less depressed, more talkative, and had a brighter affect. (Tr. 855).

On June 21, 2012, Plaintiff stated he cannot walk much because he started to get chest pain, but she encouraged him to exercise, even if he was unmotivated. (Tr. 783). She observed flat affect, depressed mood, no thought disorder, no cognitive changes, lack of motivation, and poor insight/judgment. (Tr. 784). She again assigned him a GAF score of 65. (Tr. 784).

*Opinion Evidence*

Dr. Mathew completed an Assessment of Ability to Sustain Work-Related Activities (Mental) on September 10, 2012. She opined Plaintiff had no ability to carry out short and simple instructions; sustain an ordinary routine, work in coordination with or in proximity to others; complete a normal workday and workweek without interruptions; or perform at a consistent pace without an unreasonable number of rest periods; and could only understand and remember short and simple instructions 20% of the time. (Tr. 838). She based these conclusions on the fact that Plaintiff "is constantly tired, meek, not able to keep his focus on anything. Very depressed. Short of breath with physical exertion." (Tr. 839).

She also opined Plaintiff would be able to interact appropriately 30% of the time; accept instructions and respond to criticisms 20% of the time; get along with co-workers or peers 10% of the time; and never be able to maintain socially appropriate behavior or respond to changes in the work setting. (Tr. 839). Her basis for these conclusions was, "[h]e is depressed, withdrawn, does not like to be around, withdrawn. Does not even communicate with his family much." [sic] (Tr. 839). She also concluded he would be absent more than four times per month. (Tr. 840).

---

3. A GAF score of 61-70 indicates some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships. *Id.*

In a Residual Functional Capacity ("RFC") questionnaire completed in September 2012, Dr. Nwaokafor identified Plaintiff's prognosis as fair to good although he had compliance issues. (Tr. 862). He noted Plaintiff's symptoms as fatigue, muscle weakness, episodic vision blurriness, psychological problems, and headaches. (Tr. 862). He reported Plaintiff had normal vitals and cardiopulmonary systems but that his diabetes frequently caused symptoms (Tr. 862-63). Dr. Nwaokafor opined Plaintiff could walk ten city blocks, sit for two hours, and stand for 30 minutes before needing a break; and estimated he could do any combination of those for about four hours out of an eight hour workday. (Tr. 863). He also concluded Plaintiff would need to take unscheduled breaks every two hours and would be absent from work about twice a month. (Tr. 865-66).

***Consultative Examination***

In October 2010, Plaintiff was seen by psychologist Melissa Korland, Ph.D., on a referral to assess his mental status and psychological functioning. (Tr. 722). Plaintiff was accompanied to this appointment by friend, Nicole Radke, who was also interviewed regarding Plaintiff's history. (Tr. 722). Dr. Korland stated it was difficult to interpret Plaintiff's history because of his problems with English and his disorientation and confusion throughout the interview. (Tr. 722). He did not know the age or genders of his children and Dr. Korland observed he had difficulty understanding questions and accessing language. (Tr. 722). He also appeared to have extensive memory damage and retrieval issues. (Tr. 722).

Dr. Korland's interview with Ms. Radke showed Plaintiff had normal brain scans but apparent neurological deficiencies, such as disorientation, confusion, short and long-term memory loss, difficulty focusing, agitation, irritability, and depression. (Tr. 723). Ms. Radke reported that Plaintiff had been deteriorating in day-to-day functioning since she had known him.

9

(Tr. 723). She also reported marital strife, insomnia, excessive suicidal ideation, and "feeling as if nobody likes him". (Tr. 723).

In her mental status examination, Dr. Korland noted Plaintiff was well-groomed, made no eye contact, spoke poor English, and was often difficult to understand. (Tr. 725). He had a flat affect, was excessively tearful, and appeared depressed. (Tr. 725). When asked about anxiety, Plaintiff was unable to answer and it was Ms. Radke who reported Plaintiff excessively ruminates on his condition. (Tr. 726). Dr. Korland concluded while Plaintiff was oriented to person, place, and time, he had difficulty with cognitive functioning due to brain injury. (Tr. 726). She also stated his insight and judgment were markedly impaired. (Tr. 726).

Dr. Korland stated it was difficult to establish a rapport because he was frustrated with his inability to communicate, although she noted he was generally serene and cooperative. (Tr. 725). She stated he had significant difficulty with language, that while he seemed to understand her questions he was unable to verbalize an answer. (Tr. 725). Sometimes his answers were tangential and he was often disoriented, with apparent short-term memory damage. (Tr. 725). She reported his speech was at the appropriate rate, tone, and volume, but was not goal-oriented or logical. (Tr. 725). In fact, Dr. Korland noted she needed the assistance of Ms. Radke to clarify his speech. (Tr. 725).

Dr. Korland concluded Plaintiff had language-based aphasia, disturbance in executive functioning, depression, and had a GAF score of 30[4] based on his inability to function and the apparent severity of his symptoms. (Tr. 727). Dr. Korland found Plaintiff was extremely impaired in his ability to understand, remember, and follow instructions; maintain attention and

---

4. A GAF score of 21-30 indicates behavior is considerably influenced by delusion or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day, no job, home, or friends). *Id.*

concentration, persistence, and pace; perform simple or multi-step tasks; relate to others; withstand the stress and pressures associated with day-to-day work activities; and manage finances. (Tr. 728).

### State Agency Examiners

In June 2010, Walter Holbrook, M.D., reviewed Plaintiff's medical record to determine his RFC as related to coronary artery disease. (Tr. 669, 675). It was reported Plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, stand, sit, or walk for six hours out of an eight hour day, and had an unlimited ability to push and pull including operating hand or foot controls. (Tr. 669). Further Plaintiff was able to occasionally stoop, crouch, and crawl; and had no manipulative, visual, or communicative limitations. (Tr. 670-72). However due to his heart condition, he was to avoid exposure to extreme heat or cold, humidity, and fumes, odors, gases, dust, and poor ventilation. (Tr. 672). A review of the evidence showed Plaintiff had a normal echocardiogram and completed a stress test with normal results, including functional capacity and exercise response. (Tr. 669).

On September 16, 2010, Elizabeth Das, M.D., reviewed Plaintiff's medical records and confirmed the RFC written by Dr. Holbrook. (Tr. 721). She also noted Plaintiff had poor control of his diabetes but his lungs and neurological exams were normal. (Tr. 721).

In May 2011, Dr. Das again reviewed Plaintiff's medical records, with no changes in her former opinion. (Tr. 745). At the same time, psychologist Mel Zwissler, Ph.D., evaluated Plaintiff's medical record and found no medically determinable impairment was supported by the evidence, once the consultative examination opinion had been disregarded pursuant to the fraud investigation. (Tr. 746, 758).

11

*Investigation Report*

After review of the record, Plaintiff's case was referred to the Cooperative Disability Investigations Unit ("CDIU") because the Disability Determination Service ("DDS") questioned the information Plaintiff provided. (Tr. 77). DDS requested assistance in resolving these discrepancies, mainly Plaintiff's ability to speak and understand English, his ability to work at Gepetto's Pizza, and his ability to be in public alone. (Tr. 731-32).

CDIU investigation revealed that on May 5, 2011, Plaintiff was observed working at Gepetto's alone, where he was cleaning and preparing the work area but there were no customers. (Tr. 78). He was observed as appropriately groomed and dressed, not anxious or depressed, and there was nothing unusual about his behavior. (Tr. 78, 735). Although he spoke with an accent, his pace was normal and understandable. (Tr. 78, 735). The detective placed a food order and Plaintiff was able to respond to all questions asked and posed questions of his own, even providing a more economical purchase with greater value. (Tr. 78, 735). The detective observed no difficulty interacting, understanding the food order, preparing the food order, or providing correct change. (Tr. 78, 735).

CDIU found similar fault[5] existed because "claimant knowingly provided incorrect information regarding his [mental] capability." (Tr. 78). The observations from the detective showed Plaintiff could relate appropriately, provide basic information, respond to questions, and work independently. (Tr. 78). As a result of this investigation, CDIU found the "information provided by the claimant and the claimant's third party to the adjudicator regarding his abilities and daily activities" should be disregarded. (Tr. 79). Additionally, the psychological consultative

---

5. Similar fault occurs when "(A) an incorrect or incomplete statement that is material to the determination is knowingly made; or (B) information that is material to the determination is knowingly concealed." 42 U.S.C §§ 405(u)(1)(B), 405(u)(2).

examination findings of October 21, 2011 should be disregarded because they were based solely on the Plaintiff's subjective complaints. (Tr. 79).

### *VE Testimony and ALJ Decision*

The VE classified Plaintiff's prior work as fast food restaurant manager, parts inspector, automatic punch operator, and tow motor operator. (Tr. 56). The ALJ then hypothesized an individual capable of performing light work which involved occasionally kneeling, crouching, and crawling, and avoiding exposure to extreme cold, heat, irritants, and poorly ventilated areas. (Tr. 57). The VE stated Plaintiff could perform his prior work of both fast food manager and parts inspector along with other unskilled positions such as light hand packager, electrical accessories assembler, and a cafeteria attendant. (Tr. 57-58).

Next, the ALJ added the additional restrictions of only simple, routine, and repetitive tasks with only occasional interaction with public and coworkers. (Tr. 58). The VE testified that his opinion regarding available unskilled work for Plaintiff would not change but he would no longer be able to perform his prior work. (Tr. 58).  The VE stated it was acceptable to be off task up to ten percent of the time and miss one day a month but if you added these restrictions to the second hypothetical there would be no competitive work for Plaintiff. (Tr. 59-60).

Plaintiff's counsel proposed another hypothetical where the individual could only sit for two hours out of an eight hour day and could stand for only 30 minutes, to which the VE responded no work would be available. (Tr. 61). A further hypothetical proposed the need for unscheduled breaks, to which the VE stated there was no work. (Tr. 62). Again, the VE answered no work would be available if the hypothetical individual could only remember instructions, act appropriately with coworkers, and accept criticism twenty percent of the day. (Tr. 62-63). Nor

would work be available for a person incapable of recognizing workplace hazards or who had psychiatric problems that impaired his ability to concentrate. (Tr. 63-64).

In February 2013, the ALJ found Plaintiff had the severe impairments of diabetes mellitus type 2, hypertension, degenerative disc disease, and status post 2005 bypass surgery; but these severe impairments did not meet or medically equal any listed impairment. (Tr. 14-15). The ALJ then found Plaintiff had the RFC to perform light work with only occasional kneeling, crouching, or crawling; and he would have to avoid concentrated exposure to extreme cold, heat, humidity, and irritants such as fumes, odors, dust, gas, and poorly ventilated areas. (Tr. 15-16).

Based on the record and VE testimony, the ALJ found Plaintiff could perform work his past work as a fast food manager and parts inspector; and thus was not disabled. (Tr. 21).

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for DIB is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. § 404.1520 – to determine if a claimant is disabled:

1.  Was claimant engaged in a substantial gainful activity?

2.  Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.  Does the severe impairment meet one of the listed impairments?

4.  What is claimant's residual functional capacity and can claimant perform past relevant work?

5.  Can claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

**DISCUSSION**

Plaintiff argues the ALJ erred because (1) he failed to properly evaluate the medical opinions of Plaintiff's treating physicians; and (2) the RFC does not accurately describe Plaintiff, and therefore the VE testimony cannot be substantial evidence. (Doc. 11, at 1). The Court will address each argument in turn.

### *Treating Physician Rule*

Plaintiff argues the ALJ erred by giving "little weight" to the opinions of Drs. Nwaokafor and Mathew respectively, instead of the controlling weight a treating physician should receive. (Tr. 20-21; Doc. 11, at 13). Under the regulations, a "treating source" includes physicians, psychologists, or "other acceptable medical source[s]" who provide, or have provided, medical treatment or evaluation and who have, or have had, an ongoing treatment relationship with the claimant. 20 C.F.R. § 416.902.  An ongoing treatment relationship will exist when "medical evidence establishes that [claimant] see[s], or ha[s] seen, the source with a frequency consistent with accepted medical practice". § 404.1502.

Generally, the medical opinions of treating physicians are afforded greater deference than those of non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a plaintiff's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)).

A treating physician's opinion is given "controlling weight" if it is supported by (1)

16

medically acceptable clinical and laboratory diagnostic techniques; and (2) is not inconsistent with other substantial evidence in the case record. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). The requirement to give controlling weight to a treating source is presumptive; if the ALJ decides not to do so, he must provide evidentiary support for such a finding. *Id.* at 546; *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 376-77 (6th Cir. 2013). When the physician's medical opinion is not granted controlling weight, the ALJ must give "good reasons" for the weight given to the opinion. *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)).

"Good reasons" are reasons "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Rogers*, 486 F.3d at 242 (quoting SSR 96-2p, 1996 WL 374188, at *4). When determining weight and articulating good reasons, the ALJ "must apply certain factors" to the opinion. *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.* While an ALJ is required to delineate good reasons, he is not required to enter into an "exhaustive factor-by-factor analysis" to satisfy the requirement. *See Francis v. Comm'r of Soc. Sec. Admin.*, 414 F. App'x 802, 804-05 (6th Cir. 2011).

*Dr. Nwaokafor*

The ALJ gave Dr. Nwaokafor's opinion little weight because Plaintiff's lack of treatment compliance "reduced the probative value of [the] opinion" and it was not based on any "formal and credible functional assessment". (Tr. 21). When an ALJ determines a treating physician's

opinion is not entitled to controlling weight, he must provide specific evidentiary support to refute either the opinion's objective basis or its consistency with other record evidence. *Gayheart,* 710 F.3d at 376-77. While not particularly labeled as such the ALJ does note extensively that the objective evidence does not support the physical limitations. (Tr. 19). For example, he stated Plaintiff's disc disease was described as "mild", he had a full range of motion in his back, he was doing well following the bypass surgery, his hypertension was controlled with medication, he had overall normal functional capacity, heart rate and rhythm, no evidence of retinopathy or neuropathy, and his diabetes was controlled with treatment. (Tr. 19).

However, assuming this is a sufficient to overcome the presumption of controlling weight the ALJ does not continue on to analyze the factors laid out in 20 C.F.R. § 404.1527(d)(2); or in other words provide "good reasons" for the weight given. While an argument could be made the ALJ attacked the supportability of the opinion by alluding to the lack of objective evidentiary support, that is not for this Court to surmise but, rather, should be made clear by the ALJ himself. *See Wilson,* 378 F.3d at 544. Here, the ALJ did not analyze any of the regulatory factors nor did he provide record support for the reasons given upon which this Court could review his decision. Therefore, any arguments to the contrary made by this Court would be improper *post-hoc* rationalizations. *Williams v. Comm'r of Soc. Sec.*, 227 F. App'x 463, 464 (6th Cir. 2007) (citing *S.E.C. v. Chenery*, 332 U.S. 194, 196 (1947)). Because the ALJ did not provide good reasons for the weight given remand is required to allow for further analysis of Dr. Nwaokafor's opinion.

*Dr. Mathew*

The ALJ gave little weight to Dr. Mathew's opinion because it did not appear to be based on "any specific and credible functional assessment", was inconsistent with her own assessments, particularly GAF scores, and was inconsistent with the record as a whole. (Tr. 20).

18

For an ALJ to discount a treating source opinion, the "good reasons" given must be "supported by the evidence in the case record". *Blakley v. Comm'r of Soc. Sec*., 581 F.3d 399, 406–407 (quoting SSR 96-2p, 1996 WL 374188, at *5)

The ALJ identified the contrary GAF scores and one instance of a diagnosis of mild depression as evidence that Dr. Mathew's opinion was not consistent with the mental limitations she gave to Plaintiff. (Tr. 20). While GAF scores can be a factor in proving inconsistency, alone it is not sufficient. Here the ALJ did not mention any of the other evidence that Plaintiff's mental limitations were not as severe as opined. For example, the multiple occasions where Dr. Nwaokafor observed normal mood and cognition (Tr. 595-96, 610, 612, 617, 682, 761, 768, 799, 803, 808); or where Dr. Mathew noted improvement in mood, affect, and only mild cognitive difficulties (Tr. 848, 851, 855). Nor did the ALJ make mention of the CDIU report which showed Plaintiff was capable of working alone, carrying on conversation, and handling money. (Tr. 78-79). Most importantly although this evidence was readily available it is not clear to this Court whether the ALJ took this evidence into account when making his decision. The reasons given by the ALJ are not coupled with evidence in the record and thus they are not "sufficiently specific" to allow this Court adequate review. SSR 96-2p, 1996 WL 374188, at *5 (1996); *Wilson,* 378 F.3d at 544.

A majority of the ALJ's analysis focuses on Plaintiff's credibility (*See* Tr. 17-20) and while it is proper for the ALJ to judge Plaintiff's testimony through a lens of disbelief, he is not allowed to discredit the opinions of treating physicians without providing good reasons as required by the regulations. 20 C.F.R. § 416.927(d)(2)). Although the objective evidence makes abundantly clear that the impairments are not as severe as alleged, and a different outcome on remand may be unlikely, this case requires remand for the ALJ to proffer reasons that are

"sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Rogers*, 486 F.3d at 242; *Wilson*, 378 F.3d. at 543-46.

### Substantial Evidence for RFC Determination

As a whole, Plaintiff argues the evidence does not support the ALJ's RFC determination and thus, he may not rely on the VE's testimony as substantial evidence. (Doc. 11, at 17). Plaintiff alleges this RFC does not accurately take into account his fatigue and mental impairments, both of which were supported by the opinions of Drs. Nwaokafor and Mathew. (Doc. 11, at 18). While the ALJ was not required to adopt these opinions verbatim or put restrictions in the RFC he did not believe credible, he was required to properly weigh the evidence in the record. To the extent Plaintiff is challenging the RFC determination; the Court awaits further analysis on the treating physicians' opinions on remand before making a conclusive determination on this issue.

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying DIB is not supported by substantial evidence, and therefore recommends the decision be reversed and remanded to the Commissioner in accordance with the above conclusions.


 s/James R. Knepp II
United States Magistrate Judge


ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time

WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474

U.S. 140 (1985); *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).